UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MOLLY FLANIGAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:12 CV 1706 CDP |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant, | ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying Molly Flanigan's application for Disability

Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et*

*seq.* and supplemental security income benefits under Title XVI of the Act, 42

U.S.C. §§ 1381 *et seq.* Flanigan claims she is disabled because she suffers from

bipolar disorder, attention deficit hyperactivity disorder (ADHD), and learning

disabilities. Flannigan filed an earlier action challenging the denial, but the

Commissioner requested remand for an additional hearing. After the second

hearing, the Administrative Law Judge again concluded Flanigan was not disabled.

Because I conclude that the ALJ's decision is supported by substantial evidence, I

will affirm the decision.

*Procedural History*

Flanigan filed her application for disability insurance benefits and supplemental security income on June 28, 2007. She was seventeen years old at the time. The initial onset date alleged was November 4, 1994, but was later amended to November 4, 2004. On October 30, 2007, the Social Security Administration denied Flanigan's application. Flanigan requested a hearing, and on March 10, 2009, Flanigan and her mother appeared and testified at a hearing before an ALJ. No vocational expert testified at the hearing.

On April 1, 2009, the ALJ issued an opinion upholding the denial of benefits. Flanigan appealed to the Social Security Appeals Council. The Appeals Council denied the request for review and Flanigan filed her first suit in this court for review of that decision. Case No. 4:10CV18 TCM. At the Commissioner's request, the case was remanded so the ALJ could obtain vocational expert evidence. On March 17, 2011, the ALJ conducted the supplemental hearing where Flanigan, her mother, and a vocational expert testified. On April 7, 2011, the ALJ again determined Flanigan was not disabled. The Appeals Council denied Flanigan's request for review, thereby adopting the ALJ's decision as the final decision of the Commissioner.

Flanigan again seeks judicial review of the denial. She argues that the decision of the ALJ is not supported by substantial evidence because: (1) the ALJ

failed to cite to substantial medical evidence to support his Residual Functional Capacity finding; and (2) the hypothetical question to the vocational expert did not capture the concrete consequences of Flanigan's impairment.

***Medical Records***

On November 4, 2004, Flanigan was admitted to St. John's Hospital for evaluation and treatment because of reported rebellious and oppositional behavior. Dr. Emel Sumer, M.D., diagnosed Flanigan with bipolar disorder, mixed type, and ADHD. Flanigan was prescribed Risperdal[1], Inderal[2], and Adderall.

In October 2005, Flanigan was administered a Wechsler Intelligence Scale Test for Children by a school psychologist. The test determined Flanigan had a full-scale IQ of 80, a verbal-comprehension index of 85, a perceptual-reasoning index of 84, and a working memory index of 68.

Two years later, the Special School District developed an Individualized Education Plan for Flanigan. The plan educationally diagnosed Flanigan as learning disabled in the area of written expression. The plan also determined Flanigan was language impaired in semantics and pragmatics and emotionally disturbed. Additionally, it was determined Flanigan's cognitive functioning was in the low average range. The report indicated Flanigan's learning disability in

---

[1] Risperdal is a psychotropic drug indicated for the treatment of schizophrenia and bipolar disorder. *See Physician's Desk Reference*, 1676–77 (61st ed. 2007).
[2] Inderal is a synthetic beta-adrenergic receptor-blocking agent indicated for the treatment of common migraine headaches. *Id.* at 3429.

written language caused her to struggle with written directions and organizational skills; Flanigan's language impairment resulted in difficulties with oral instruction and staying on task with written activities; and Flanigan's emotional disturbance caused her difficulties with following directions or expectations, staying on task, completing tasks, and appropriate social interaction.

On April 19, 2007, Flanigan was admitted to an in-patient mental-health program at St. Joseph's Health Center. Flanigan was hospitalized because of a text-message she sent to a friend stating she wanted "to end it." Flanigan denied having a suicide plan. It was reported that Flanigan's grades were falling, she was having problems concentrating, and was experiencing anxiety and decreased interest in school and sports. Flanigan was diagnosed with major depressive disorder, generalized anxiety disorder, and a history of ADHD. After receiving medication and counseling, Flanigan's condition improved. Prior to being discharged, Flanigan received a Global Assessment of Functioning[3] (GAF) score of 50 and was instructed to follow up with a psychiatrist named Dr. Srinivas Battula, M.D..

_____

[3] The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational, and psychological functioning "on a hypothetical continuum of mental health-illness." *Diagnostic & Statistical Manual of Mental Disorders*, 32 (4th ed. Am. Psychiatric Ass'n 1994) [hereinafter DSM—IV]. A GAF of 61 to 70 indicates "some difficulty in social, occupational, or school functioning…." *Id.* A GAF of 61 to 70 indicates "some difficulty in social, occupational, or school functioning, but generally functioning pretty well." *Id.*

Flanigan's first visit with Dr. Battula was on June 19, 2007. Dr. Battula recommended individual therapy for possible depression and bipolar disorder. Since Flanigan was pregnant, Dr. Battula recommended medications only after she delivered.

Dr. Battula saw Flanigan for a follow-up appointment on August 1, 2007. Dr. Battula found that Flanigan had a good mood, was logical and goal directed, and had good/fair insight and judgment. Dr. Battula diagnosed Flanigan with bipolar affective disorder, ADHD, and assessed a GAF score of 55.

On October 29, 2007, R. Rocco Cottone, Ph.D., a non-examining consultant, completed a Mental Residual Functional Capacity Assessment. Based on the records, Dr. Cottone determined that Flanigan had marked limitations in the ability to understand and remember detailed instructions and the ability to carry out detailed instructions. She had moderate limitations in the ability to maintain attention and concentration for extended periods; the ability to sustain an ordinary routine without special supervision; the ability to work with others without being distracted; the ability to complete a normal workday and workweek and to perform at a consistent pace; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism; the ability to get along with coworkers; the ability to travel in unfamiliar places or use public transportation; and the ability to set realistic goals or make independent plans. He

concluded that she should avoid work involving intense or extensive interpersonal interaction; handling complaints or dissatisfied customers; and close proximity to co-workers.  He found that she could understand, remember, carry out and persist at simple tasks; make simple work-related judgments; relate adequately to co-workers or supervisors; and adjust adequately to ordinary changes in work routines or settings.  Her restrictions of activities of daily living were therefore mild; she had moderate difficulties in maintaining social functions and concentration, persistence or pace; and she had one or two episodes of decompensation of extended duration.

At the same time Dr. Cottone completed a Childhood Disability Evaluation Form for Flanigan.  He concluded that she had no marked limitations.  She had less than marked limitations in the areas of  acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for herself, and no limitations in moving about and manipulating objects.

Flanigan saw Dr. Battula on November 7, 2007, January 28, 2008, July 19, 2008, and February 4, 2009.  On these visits, Dr. Battula diagnosed Flanigan with bipolar affective disorder, major depression disorder, and ADHD. Additionally, Dr. Battula assessed GAF scores of 55, 60, 70, and 60, respectively.

Dr. Battula filled out a Mental Residual Functional Capacity Questionnaire on March 12, 2009.  He  reported Flanigan's symptoms as anhedonia, decreased

energy, feelings of guilt or worthlessness, generalized persistent anxiety, mood disturbances, difficulty thinking or concentrating, persistent disturbances of mood or affect, and apprehensive expectations. Dr. Battula determined Flanigan was unable to meet competitive standards in maintaining regular attendance and being punctual within customary, strict tolerances; accepting instructions and responding appropriately to criticism from supervisors; dealing with normal work stress; carrying out detailed instructions; setting realistic goals or making plans independently of others; and dealing with stress of semi-skilled and skilled work. Dr. Battula estimated that Flanigan's impairments or treatment would cause her to be absent from work around three times per month.

After the first denial of benefits in 2009 and before the second hearing on March 17, 2011, Flanigan received no additional medical treatment.

*Testimony Before the ALJ*

At the first ALJ hearing on March 10, 2009, Flanigan stated she was nineteen years old and expected to graduate high school within a few months. She was taking regular classes but received additional help in a resource room. She participated in a co-op program that included working twenty to twenty-five hours a week at a McDonalds. From June 2006 until September 2007 she had worked thirty to thirty-five hours a week at a nursing home as a food server. Flanigan obtained this job competitively, but quit after she moved. Additionally, Flanigan

explained she had times where she had lots of energy and difficulty sleeping and also times where she is depressed. Flanigan testified that her condition made it difficult for her to get along with people. She also said that she often needs people to repeat things for her. Flanigan stated that she enjoyed playing basketball, hanging out with her friends, and her household chores that included dishes, laundry, and occasionally grocery shopping with her mother.

Flanigan's mother also testified at the first hearing and stated that Flanigan used to hide her pills in planters, but as far as she knew her daughter has taken her medication for the past year. Flanigan's mother also testified that Flanigan seemed confused all the time, could not follow directions, got into fights at school, was involved in the emotional lives of her friends, and required reminders to do things.

At the supplemental hearing on March 17, 2011, Flanigan, her mother, and a vocational expert testified. Flanigan stated that she had graduated high school and was no longer working at McDonalds. She said she quit working at McDonalds because of her daily arguments with co-workers. After leaving McDonalds, Flanigan briefly worked at a Jack in the Box. Flanigan stated she was not currently taking any medications or seeing any doctors but that she was looking "here and there" for a doctor. The reason, Flanigan claimed, for not finding a doctor was that she was "picky."

Flanigan's mother testified that she was concerned by Flanigan's depression. She stated that Flanigan now has two children, and that Flanigan never interacts with the children. Her mother then clarified that Flanigan takes care of the two children while her mother is at work, but not when she is home. She also indicated that the children showed no signs of abuse or neglect. Additionally, Flanigan jumped out of a moving car when her mother tried to take her to the doctor. Flanigan's mother also stated Flanigan was "hooked" on her cell phone and goes out with friends "almost every day."

The ALJ heard testimony from Brenda Young, a vocational expert. The ALJ questioned Mrs. Young about a hypothetical person of the same age, experience, education, and residual functional capacity as Flanigan. The vocational expert testified that such a person could perform the representative jobs of hand packer, laundry worker, and housekeeper. Additionally, Mrs. Young testified these jobs were available in the St. Louis metro area.

Flanigan's attorney asked whether a hypothetical person who is unable to meet competitive standards and would miss three days of work each month could perform any competitive employment. Mrs. Young responded that no such jobs exist.

*Legal Standard*

A reviewing court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support" the ALJ's determination. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010) (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)) (internal quotation marks omitted). The court will consider evidence both supporting and detracting from the Commissioner's findings, however, if it is possible to draw two inconsistent positions from the evidence and one supports the Commissioner's findings, then the denial of benefits must be affirmed. *Id.*

To determine whether a decision is supported by substantial evidence, the court is required to review the administrative record as a whole to consider:

1) the credibility findings made by the Administrative Law Judge;

2) the education, background, work history, and age of the claimant;

3) the medical evidence from treating and consulting physicians;

4) the plaintiff's subjective complaints relating to the exertional and non-exertional impairments;

5) any corroboration by third parties of the plaintiff's impairments; and

6) the testimony of vocational experts, when required, which is based on a proper hypothetical question.

*Brand v. Secretary of Dep't of Health Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

Social security regulations define disability as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 416(i)(l); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a).

Determining whether a claimant is disabled requires the Commissioner to evaluate the claim based on a five-step procedure. 20 C.F.R. § 404.1520(a), 416.920(a); see also *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process).

First, the Commissioner must decide whether the claimant is engaging in substantial gainful activity. If so, she is not disabled.

Second, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities. If the impairment is not severe, the claimant is not disabled.

Third, if the claimant has a severe impairment, the Commissioner evaluates whether it meets or exceeds a listed impairment found in 20 C.F.R. Part 404,

Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

Fourth, if the claimant has a severe impairment and the Commissioner cannot make a decision based on the claimant's current work activity or on medical facts alone, the Commissioner determines whether the claimant can perform past relevant work. If the claimant can perform past relevant work, she is not disabled.

Fifth, if the claimant cannot perform past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy. If not, she is declared disabled. 20 C.F.R. § 404.1520; § 416.920.

The Commissioner has supplemented the five-step sequential process for evaluating a claimant's eligibility for benefits with additional regulations dealing specifically with mental impairments. 20 C.F.R. § 404.1520a. As relevant here, the procedure requires an ALJ to determine the degree of functional loss resulting from a mental impairment. The ALJ considers loss of function in four capacities deemed essential to work. 20 C.F.R. § 404.1520a(c)(2). These capacities are: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) deterioration or decompensation in work or work-like settings. 20 C.F.R. § 404.1520a(c)(3). After considering these areas of function, the ALJ rates limitations in the first three areas as either: none; mild; moderate; marked; or extreme. The degree of limitation in regard to episodes of decompensation is

determined by application of a four-point scale: none; one or two; three; or four or more.  See 20 C.F.R. § 404.1520a(c)(4).

***The ALJ's Findings***

Applying the five-step sequential evaluation, the ALJ first determined Flanigan was not engaging in any substantial gainful activity.  Although Flanigan worked after the established disability onset date, this work activity did not rise to the level of substantial gainful activity.

Proceeding to step two, the ALJ determined Flanigan had severe impairments including bipolar disorder, ADHD, and learning disabilities.  The analysis of this step was fully addressed in the ALJ's first opinion and incorporated by the ALJ's second opinion after the supplemental hearing.

At step three, the ALJ determined Flanigan did not have an impairment or combination of impairments meeting or medically equaling one found in the Listings.  The ALJ supported this finding by Flanigan's own attorney stipulating during the initial hearing that none of Flanigan's impairments met or equaled any listed impairment.

The ALJ found Flanigan did not meet the "paragraph B" criteria ("paragraph D" criteria of Listing 12.05) because her impairments did not cause at least two "marked" limitations or one "marked" limitation and "repeated episodes of decompensation."  The ALJ also determined the "paragraph B" criteria for Listing

12.05 were not met since Flanigan did not have a valid verbal, performance, or full scale IQ of 59 or less. Lastly, the "paragraph C" criteria in Listing 12.05 were not met because Flanigan did not have a valid verbal, performance, or full scale IQ of 60 through 70.

In considering Flanigan's functional limitations, the ALJ found Flanigan had the following limitations: mild restrictions on activities of daily living; moderate difficulties maintaining social functioning; moderate difficulties maintaining concentration, persistence, and pace; and one or two episodes of decompensation of extended duration. In making this determination, the ALJ considered the Mental Residual Functional Capacity Questionnaire by Dr. Battula, but the ALJ did not agree with Dr. Battula's conclusions.

At step four, the ALJ determined Flanigan had the residual functional capacity to perform work at all exertional levels, but was limited to unskilled work requiring only occasional contact with the public. The ALJ found evidence of an underlying impairment that could reasonably cause some of Flanigan's symptoms. However, the medical evidence did not demonstrate medical signs or findings that could reasonably produce all the symptoms and limitations that Flanigan alleged. The ALJ pointed to Flanigan's lack of consistent treatment by a mental health professional and not taking medications during a period of alleged disability as inconsistent with the severe limitations alleged.

The ALJ gave little weight to Dr. Battula's opinions for several reasons. First, the ALJ determined Dr. Battula's opinions were inconsistent with the doctor's own treating notes and GAF scores for Flanigan. The ALJ found Dr. Battula's opinions were based, in large part, on the subjective report of symptoms and limitations given by Flanigan. Additionally, the ALJ determined Dr. Battula's opinions were conclusory with little explanation of the medical evidence relied upon in forming the opinion. Lastly, Dr. Battula's assessment form was considered by the ALJ to be vague and non-specific.

The ALJ gave more weight to the State agency medical consultant's assessments, which included a Psychiatric Review Technique form. Dr. Cottone found Flanigan had organic and affective mental disorders. Flanigan's organic mental disorders included ADHD and a learning disorder by history. Dr. Cottone determined Flanigan's functional limitations to include the following: mild restrictions of activities of daily living; moderate difficulties maintaining social functioning; moderate difficulties maintaining concentration, persistence, and pace; and no episodes of decompensation of extended duration. Dr. Cottone also indicated Flanigan's marked limitations in her ability to understand, remember, and carry out detailed instructions. The ALJ determined Dr. Cottone's findings were consistent with the evidence as a whole.

The ALJ discredited most of Flanigan's description of her limited daily activities. The ALJ determined it was difficult to attribute Flanigan's allegedly limited daily activities to her medical condition because the medical evidence in the record was relatively weak. The ALJ pointed to evidence such as Flanigan's previous job at the nursing home, her ability to care for two small children, and her ability to socialize with friends as inconsistent with her alleged limitations. The ALJ also considered Flanigan's unpersuasive appearance and demeanor while testifying as inconsistent with her alleged limitations. For instance, the ALJ noted Flanigan had no difficulty in understanding or responding to questions. However, the ALJ stated this was only one of many factors being relied upon in determining Flanigan's credibility and residual functional capacity.

The ALJ discredited the testimony by Flanigan's mother as possibly biased due to her financial interest in the matter and based completely on Flanigan's subjective complaints.

In conclusion, the ALJ determined Flanigan had medically determinable impairments that could reasonably be expected to cause the alleged symptoms, however, Flanigan's statements regarding intensity, persistence, and limiting effects of those symptoms were not entirely credible.

At step five, the ALJ found that Flanigan had no past relevant work. However, in considering Flanigan's age, education, work experience, and residual

functional capacity, the ALJ determined Flanigan could perform the jobs of hand packer, laundry worker, or housekeeper. All of these jobs were found to exist in the national economy. In coming to this determination, the ALJ relied on the vocational expert's response to his hypothetical question. The ALJ discredited as unsupported by credible evidence the hypothetical question posed by Flanigan's attorney.

*Discussion*

In reviewing the denial of Social Security benefits a court must determine whether there is substantial evidence on the record to support the ALJ's decision. 42 U.S.C. 405(g). Flanigan argues that substantial evidence is lacking because: (1) the ALJ failed to support his residual functional capacity conclusion with medical evidence; and (2) the ALJ failed to capture the concrete consequences of Flanigan's impairments in his hypothetical question. She argues that the ALJ improperly discounted her treating physician's opinions while giving more weight to the State agency's non-examining physician. In making this argument, Flanigan cites to *Lauer v. Apfel*, 245 F.3d 700 (8th Cir. 2001) and *Singh v. Apfel*, 222 F.3d 448 (8th Cir. 2000).

*The Treating Physician's Opinion*

In *Singh*, the Eight Circuit concluded the ALJ, in determining the claimant's RFC, improperly discredited the treating physician's opinion. 222 F.3d at 453. In

that case, the ALJ found the treating physician's opinion was not supported by objective evidence but instead was largely based on the claimant's subjective complaints of pain. *Id.* at 452. No other reason or explanation was given to why the treating physician's opinion was discredited. *Id.* The Eight Circuit stated a treating physician's opinion will be granted controlling weight, provided the opinion is well-supported and not inconsistent with other substantial evidence on the record. *Id.* The court found the treating physician's opinion was well supported and not inconsistent with other substantial evidence. *Id.* Therefore, the ALJ erred in discrediting the treating physician's opinion. *Id.*

*Singh* does not control this case. In *Singh*, the court noted that the treating physician's opinion will be given controlling weight *if* the opinion is well supported and not inconsistent with other substantial evidence. In that case, the ALJ did not explain in detail the reasons for discrediting the treating physician's opinion. Here, the ALJ explained in great detail why little weight should be given to Dr. Battula's opinion.

The ALJ pointed out that Dr. Battula's opinion was not only internally inconsistent but was also inconsistent with other medical evidence. For instance, Dr. Battula stated in his opinion that Flanigan had persistent disturbances of mood or affect along with a sad and anxious demeanor. Nevertheless, Dr. Battula

consistently reported in his treatment notes that Flanigan had a good mood and indicated normal mental-status examinations.

Additionally, Dr. Battula's opinion that Flanigan cannot perform some of the tasks associated with unskilled work is inconsistent with the doctor's own GAF scores given to Flanigan during her examinations. Dr. Battula consistently assigned Flanigan GAF scores of 60 to 70 during her examinations. These scores do not suggest the more extreme limitations in Dr. Battula's opinion but instead are consistent with mild to moderate symptoms.

Dr. Battula determined Flanigan could not satisfactorily perform the following activities on a sustained basis in a regular work setting: maintain regular attendance; accept instructions; deal with work stress; carry out detailed instructions; set realistic goals; make plans independently; and handle the stress of semiskilled and skilled work. However, Dr. Battula also determined Flanigan could satisfactorily do the following: remember work-like procedures; understand, remember, and carry out very short and simple instructions; make simple work-related decisions; perform at a consistent pace without an unreasonable number and length of rest periods; make simple requests or request assistance; be aware of normal hazards and take appropriate precautions; interact appropriately with the general public; maintain socially appropriate behavior; and adhere to basic standards of neatness and cleanliness. Dr. Battula's opinion is that Flanigan cannot

perform some of the requirements of unskilled work.  However, the doctor's opinion of Flanigan's limitations really only pertains to skilled and semi-skilled work.  Therefore, Dr. Battula's opinion is internally inconsistent.  Even if Dr. Battula's more extreme limitations are taken as accurate, the ALJ's RFC determination for unskilled labor is still consistent with those limitations.

Additionally, the ALJ determined Flanigan's opinion was conclusory with very little explanation of medical evidence relied upon in forming the opinions.  Flanigan claims that this is incorrect because Dr. Battula's opinion contained specific signs and symptoms associated with his conclusions.  Though this is true with regard to some of Dr. Battula's examinations, Dr. Battula did not generally explain what medical evidence he relied on in forming his opinions.

Lastly, as the ALJ pointed out, Flanigan's alleged onset date is in 2004, but she did not begin seeing Dr. Battula until 2007.  Therefore, Dr. Battula's medical opinion only covers Flanigan's condition after 2007.  Furthermore, Dr. Battula's last treated Flanigan in 2009, and therefore the doctor's opinion only covers from 2007 to 2009.

A treating physician's opinion is usually given controlling weight, however, an ALJ may discredit such an opinion if it is inconsistent with other substantial evidence in the record.  *Cox*, 471 F.3d at 907.  Here, the ALJ properly found Dr. Battula's opinion was internally inconsistent, inconsistent with his treatment notes,

and inconsistent with the medical evidence as a whole. Therefore, it was not improper for the ALJ to discredit Dr. Battula's opinion.

### The ALJ Discrediting Flanigan's Subjective Complaints

The ALJ also determined Dr. Battula's opinion to be discredited because it was based on Flanigan's subjective complaints instead of medical evidence. Although the ALJ did not expressly mention the *Polaski* factors, it is evident from the ALJ's decision that such factors were analyzed. For instance, the ALJ noted Flanigan's daily activities such as caring for her two children and social activities with friends were inconsistent with the severity of her claims. Additionally, Flanigan claimed she could not work because of her difficulty concentrating and getting along with others, however, Flanigan was able to work competitively at a nursing home and only left because she moved.

The ALJ also considered Flanigan's lack of continuous medical treatment and not taking medications as inconsistent with her claims of a severe mental impairment.

Lastly, the ALJ found Flanigan's medical record, including treatment notes and GAF scores, were inconsistent with her claimed severe mental impairments. For example, Flanigan's treatment notes regularly demonstrated normal mental-status examinations. Additionally, Flanigan received consistent GAF scores of 55–70, which only indicates mild or moderate limitations.

Therefore, the ALJ properly discredited Flanigan's subjective complaints of a severe mental impairment.

### *The ALJ's RFC Determination*

In *Lauer*, the Eighth Circuit determined the ALJ failed to cite "some medical evidence" in making his RFC determination. 245 F.3d at 704. In that case, the ALJ rejected the treating physicians' opinions and instead relied solely upon the opinion of a prior treating psychiatrist in determining the claimant's RFC. *Id.* However, the prior treating psychiatrist was never asked to express an opinion about the claimant's ability to participate in work-related activities. *Id.* at 705. Therefore, the prior psychiatrist's opinion was not considered "some medical evidence" because it did not relate to the claimant's ability to participate in work-related activities. *Id.* Thus, the ALJ erred in basing his RFC determination on this evidence. *Id.*

*Lauer* does not apply to this case. First, in *Lauer* the non-examining physician's opinion was not considered "some medical evidence" because the physician was never asked to comment on the claimant's ability to participate in work-related activities. Here, the ALJ did rely on "some medical evidence" in determining Flanigan's RFC. The ALJ in making his RFC determination considered the entire record, including Flanigan's medical records, Flanigan's testimony, and the medical opinions of record.

Flanigan's medical records support the ALJ's RFC determination that Flanigan could perform unskilled work. For instance, the ALJ noted Flanigan consistently received GAF scores between 60 and 70, reflecting only mild to moderate limitations. An ALJ may consider GAF scores in determining a claimant's RFC, however, such scores are not considered dispositive. *Halverson v. Astrue*, 600 F.3d 922, 930–31 (8th Cir. 2010). The ALJ also found Flanigan's consistently normal mental-status examinations supported the RFC determination.

Though the ALJ discredited much of Flanigan's complaints of the severity of her mental impairments, the ALJ's RFC determination reflects some of those impairments. For instance, Flanigan's RFC is limited to only occasional contact with the public, therefore incorporating Flanigan's alleged inability to work with other people. Additionally, the ALJ's limitation to unskilled work reflects Flanigan's mental impairment complaints.

The ALJ also relied upon the opinion of Dr. Cottone in determining Flanigan's RFC. Dr. Cottone determined Flanigan could understand, remember, carry out, and persist at simple tasks; make simple work-related decisions; relate adequately to co-workers and supervisors; and adjust adequately to ordinary changes in work routine or setting. As the Commissioner points out, these limitations are consistent with unskilled work defined under 20 C.F.R. §§404.1568(a), 416.968(a). As pointed out by the Commissioner, an ALJ may rely

on a non-examining physician's opinion when the record contains no credible opinion from a treating source. *See Hacker v. Barnhart*, 459 F.3d 934, 939 (8th Cir. 2006). As determined above, the ALJ properly discredited Dr. Battula's opinion.

The ALJ's reliance on Flanigan's treatment notes, Flanigan's own testimony, and the opinion of Dr. Cottone constitutes substantial evidence supporting the ALJ's RFC determination. Furthermore, the ALJ's consideration of Flanigan's treatment notes and Dr. Cottone's opinion constitutes "some medical evidence" in support of the ALJ's RFC determination.

## *ALJ's Listing of Impairments Decision*

Flanigan claims that if Dr. Cottone's report is accepted and held generally consistent with the evidence of record, then the ALJ's decision with regard to the listing of impairments is called into question. Flanigan argues that Dr. Cottone's opinion as to Flanigan's borderline intellectual functioning along with her working memory IQ of 68 suffices to establish Listings 112.05 and 12.05 for intellectual disability.

To meet Listing 112.05D or 12.05C, Flanigan has to demonstrate the following factors: (1) a "valid verbal, performance, or full scale IQ of 60 through 70"; and (2) "a physical or other mental impairment imposing an additional and significant work-related limitation of function" *See* 20 C.F.R. pt. 404, subpt. P,

app. 1, §§ 12.05, 12.05C, 112.05, 112.05D. When Flanigan was fifteen years old a Weschler Intelligence Scale for Children determined Flanigan had a full-scale IQ of 80. Flanigan's argument that her working memory score of 68 on the Weschler Intelligence Test qualifies her under 112.05D and 12.05C is simply wrong, as the Listings require a "verbal, performance, or full scale IQ of 60 through 70." Flanigan received a full-scale score of 80, a verbal-comprehension score of 85, and a perceptual-reasoning index of 84, thereby excluding her from Listing 112.05D and 12.05C. Additionally, Dr. Battula determined Flanigan did not have a low IQ or any reduced intellectual functioning and Dr. Cottone specifically found Flanigan did not meet the requirements for intellectual disability under the Listings.

Along with not being able to show the required IQ score under 12.05C and 112.05D, Flanigan failed to demonstrate any deficits in adaptive functioning.[4] As the Commissioner points out, Flanigan graduated from high school, worked part-time, had friends, and cared for her children during the day. These findings are inconsistent with deficits in adaptive functioning.

### Whether ALJ's Hypothetical Question Captured Concrete Consequences of Impairment

The ALJ asked the vocational expert whether a hypothetical claimant with the same residual functional capacities as Flanigan could perform jobs available in

_____
[4] Under 12.05 and 112.05 the claimant must show a deficit in adaptive functioning manifested during the developmental period.

the national economy.  The vocational expert responded that a claimant with

Flanigan's residual functional capacity could perform the representative jobs of

hand packer, laundry worker, and housekeeper.  Additionally, the ALJ discredited

the hypothetical question by Flanigan's attorney as unsupported by the evidence.

The question asked whether a person who is unable to meet competitive standards

and would miss three days of work a month could perform the above jobs.

"The ALJ's hypothetical question to the vocational expert needs to include

only those impairments that the ALJ finds are substantially supported by the record

as a whole."  *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011) (citing *Lacroix*

*v. Barhart*, 465 F.3d 881, 889 (8th Cir. 2006)).

Here, as noted above, the ALJ relied upon substantial evidence along with

some medical evidence in determining Flanigan's RFC.  The hypothetical was then

based on that RFC, and was therefore proper and included the appropriate

limitations.  The ALJ was not required to include limitations that he did not find

supported by the evidence, and therefore his rejection of the question posed by

Flanigan's counsel was not error.

## *Conclusion*

Because the ALJ's determination that Flanigan suffers no disability is

supported by substantial evidence, I will affirm the decision of the Commissioner.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed. A separate judgment in accordance with this Memorandum and Order is entered this same date.


_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 3rd day of December, 2013.